## Commonwealth ex rel. Baird v. Noyes, Supt.

*H. Lester Hawes*, for relatrix.

*Wisler, Pearlstine, Talone & Gerber*, for Commonwealth.

*Wright, Mauck, Hawes & Spencer*, for Mr. Baird.

KNIGHT, P. J., May 15, 1952.—On or about June 1, 1949, relatrix, Anna R. Baird, was admitted to the Friends Hospital in Philadelphia upon an application

signed by her husband, William Martyn Baird, Jr., and the certificate of two physicians, by virtue of the provisions of section 302 of the Mental Health Act of July 11, 1923, P. L. 998, as amended. On or about July 19, 1949, relatrix was transferred to the Norristown State Hospital under the provisions of section 401 of the Mental Health Act, supra.

On April 1, 1952, upon petition, signed and sworn to by J. Kennard Weaver, averring that relatrix was illegally detained in the Norristown State Hospital, a writ of habeas corpus was awarded and a hearing held on April 4, 1952. Continued hearings were held on April 17th and May 1st. At these hearings much testimony was produced. Dr. Frederick H. Leavitt, a well-qualified physician specializing in neurology and psychiatry, testified that he examined relatrix at the Norristown State Hospital on March 22, 1952, and that in his opinion relatrix was of sufficient mental capacity at the present time as to not require treatment in a mental hospital and that she could be discharged from the hospital with safety to herself and others. In the opinion of the witness relatrix is of average normal sanity.

After examining the record of relatrix the witness returned to the stand and changed his testimony in some respects by saying that he was then of the opinion that relatrix had suffered from mental illness but had entirely recovered. Dr. Anthony S. Tornay of Philadelphia, another well-qualified psychiatrist, also examined relatrix and corroborated Dr. Leavitt in his opinion that relatrix at this time is normal and sane.

The circumstances under which the two physicians made their examinations would tend to detract from the weight of their opinions.

Several nonprofessional witnesses were called by relatrix, all of whom stated in their opinions that relatrix was a normal and perfectly sane person.

These lay witnesses included a friend of many years who had visited her a number of times at the State hospital and one of the nurses of the institution, who was brought into court by subpoena. Naomi N. Davis, a former patient of the hospital who knew relatrix in the institution, testified that in her opinion relatrix was normal in every respect .

At the meeting on March 22, 1952, when relatrix was examined by the physicians, a number of the clergy were present and asked her questions of a religious nature. Three of these gentlemen, Bishop Cloak, Rev. Edwin Bustard and Rev. John D. Herr took the stand and testified that relatrix was, in their opinion, normal and sane.

The husband of relatrix took the stand. Both the relatrix and her husband are foreign missionaries and he told of their life in Korea and Mexico. He testified that relatrix thought or imagined that his family were against her and that relatrix finally turned against him and accused him of being a disloyal husband, that she thought or imagined that a friend of theirs was cheating them and that she was constantly upbraiding him about the way he was spending money and that it came to the point where she would not eat with him and his condition became unbearable. He characterized all her charges as imaginary and delusionary. He finally secured their transfer from Mexico north and through his efforts had her admitted to the Friends Hospital for treatment.

The Rev. James Gordon Holcroft, an official of the Board of Foreign Missions, which employed relatrix and her husband, testified that he received a letter from relatrix while she was in Mexico, complaining about the conduct of her husband and that several weeks later he received a long letter from the husband containing a detailed account of the actions of relatrix and telling him the situation had become unbearable

to him. On the basis of these letters he ordered their return to the United States. The witness visited relatrix while she was in the Friends Hospital and in the State Institution and she complained bitterly about what she claimed was her unjustified detention in a mental hospital.

After relatrix had been in the State hospital for about six months, it was decided to place her on probation and she was allowed to enter the home of Mr. and Mrs. Weidoff, near Norristown. Mrs. Weidoff testified that at first her conduct was very good, but then she began complaining about the conduct of her husband in committing her to a mental hospital and continually returned to this subject, citing as her authority for stating that she was unjustly confined many passages from the Bible. After seven weeks, she was returned to the hospital. Dr. Noyes, Superintendent of the Norristown State Hospital, in whom we have great confidence, testified that relatrix was suffering from a form of paranoia, characterized by delusions of persecution and that she should be retained in the hospital for her own welfare. We will comment later on the testimony of Dr. Noyes.

There is not a scintilla of evidence that relatrix ever offered physical violence to anyone or that she ever caused a breach of the peace. There is not a hint of any conduct that would reflect upon her character or morals. She may have delusions, but they may not interfere with her life in the free world, particularly if she lives separate and apart from her husband. At best, the evidence of her mental illness is balanced and every reasonable doubt should be resolved in favor of her freedom.

There is a charge that she is overgenerous toward religious projects and that she may give away her small estate to the church. We are not here concerned with her money, but with her freedom.

Section 406 of the Mental Health Act, supra, as amended, provides:

"Any proper court shall have the power and authority to order and compel the discharge of any mental patient committed by such court to any mental hospital if, upon hearing, it shall be made to appear that such discharge is for the best interests of the patient and not incompatible with the public welfare and safety."

Relatrix was not committed to the Norristown State Hospital by this court or any other court and the above provision, in our opinion, does not apply to her but it does indicate the reasons which would justify the court in discharging a mental patient.

The evidence shows that the release of relatrix would not be incompatible with the public welfare and safety. It is certainly to the interest of relatrix that she be given her liberty and we are of the opinion that her mental illness, if she has any, is not of such a nature that she should not be given an opportunity to demonstrate by her conduct that she can live the life of an average normal person in the free world. We think that her best interests would be served by giving her that opportunity.

Irrespective of section 406, supra, we think the court has the inherent right to award a writ of habeas corpus upon the application of any respectable person alleging that a person is illegally detained in a mental hospital. See also the Act of April 20, 1869, P. L. 78, sec. 3, 50 PS §592.

Turning to the decided cases we find there is a singular lack of authority on the question before us.

The earliest case we could find is Commonwealth ex rel. Nyce v. Kirkbride, 2 Brewster 400, decided about 1870 by the Common Pleas Court of Philadelphia County. In that case the court discharged relator, although the evidence showed that he had delusions of

persecution. The well-considered opinion of Judge Brewster supports the following quotations from the syllabus:

"A person alleged to be insane, but against whom there has been no inquisition and finding of lunacy, should not be deprived of his liberty save in extreme cases where the public peace, or morals, or the interest of the patient requires it. . . . Where there has been no finding of lunacy and the case does not fall within the exceptions of stern necessity, the party cannot be confined."

In Gresh's Case, 12 Pa. C. C. 295 (1892), Judge Ikeler of Montour County discharged relator, a patient in a State mental hospital, upon evidence showing that he had recovered, although this evidence was contradicted. In the course of the opinion the court said:

"Even if the evidence balanced it would be our duty to discharge the relator unless it be clearly shown to the court, that the public peace, the morals, or the interests of himself and family imperatively demand his detention."

In Commonwealth v. The State Hospital for the Insane, 45 Pa. C. C. 75 (1917), relator had been in the institution 17 years. He had been convicted of a crime of violence and was committed to the mental hospital after being convicted of making threats. The medical testimony was to the effect that he would, because of his delusions, be likely to harm others if released. The court found that further confinement in the hospital was necessary for the safety of others and the public peace. The application for release was refused.

In the course of the opinion in the above case, Judge Evans, of Montour County, said:

"In Com. v. Kirkbride, 7 Phila. 8, it is held that a man should not suffer imprisonment 'even after a finding of lunacy against him, unless it plainly appeared

that his own good or the good of the public, or of his estate, required his commitment.' In Rubright's Case, 3 Pitts. 305, the court held: 'No one should be committed to an insane hospital unless it appears that the welfare of the patient or the safety of others require such restraint. One perfectly harmless should not be imprisoned within the walls of an insane asylum.' In Com. v. Giben, 2 Del. 41, we find this statement: 'An insane person to forfeit his liberty, must be dangerous to himself or others. The law will not permit a perpetual imprisonment simply because of partial insanity —in a case of this kind every doubt should be resolved in favor of the relator's liberty."

All of the cases seem to hold that a person should not be detained in a mental hospital unless it clearly and convincingly is shown that such detention was necessary for the safety of the public or the welfare of the detained person.

Dr. Noyes, Superintendent of the Norristown State Hospital, testified that in his opinion relatrix would not violate the criminal law if released nor would she do physical injury to herself. He further testified that if the husband of relatrix requested her release and would be responsible for her conduct in the free world, he would discharge her.

Dr. Noyes testified, however, that she should remain in the hospital for her own welfare, that she might become involved in controversies and cause trouble for herself and others. Granted this to be true we are of the opinion that this is not sufficient cause to deprive her of her liberty. The hearing judge is not competent to pass upon the mental condition of relatrix, he can only be guided by his observation of relatrix and the opinions of those more competent than himself in such matters. As a witness relatrix appeared to be a highly intelligent, cultured and educated woman with a remarkable memory for dates and places. She may be

subject to delusions as her outbursts on the stand about the food and the brutality of the physicians at the State hospital would seem to indicate, but we do not think these delusions would lead to a breach of the peace and we are sure they would not adversely affect the public morals. Such delusions as she may have in our opinion do not imperatively demand her retention in the State hospital for her own welfare.

Relatrix has received no medical treatments since about a month after her admission to the State hospital and Dr. Noyes testified that the prognosis was unfavorable.

This means that upon the certificate of two physicians, without any hearing, without a judicial finding that she is insane, relatrix could be confined in a mental hospital the rest of her life. Under our system of jurisprudence the verdict of a jury always stands between the citizen and the jail doors and this relatrix should not be further deprived of her liberty unless clear and impelling reasons are shown to warrant it and in our opinion such reasons have not been shown.

Relatrix should be given an opportunity to demonstrate that she can live in the free world the life of an average normal person.

We will therefore order her release from the Norristown State Hospital and continue the case until January 9, 1953. If relatrix during that time can show by her conduct that she is no longer a fit subject for commitment to a mental hospital, her final and complete discharge will be granted.

And now, May 15, 1952, respondent, Dr. Arthur P. Noyes, superintendent of the Norristown State Hospital, is directed forthwith to release relatrix, Anna R. Baird, from the Norristown State Hospital.

Respondent, Dr. Arthur P. Noyes, and the Norristown State Hospital are hereby relieved from all responsibility for the care, maintenance and treatment of

Anna R. Baird until further order of the court.

The case is continued to Friday, January 9, 1953, at 10 a.m., in courtroom A.